UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| 3000 E. IMPERIAL, LLC,<br><br>         Plaintiff,<br><br>    v.<br><br>ROBERTSHAW CONTROLS CO., et al.<br><br>         Defendants. | No.  CV 08-3985 PA (Ex)<br><br>FINDINGS OF FACT AND<br>CONCLUSIONS OF LAW |

A court trial was held on March 25-26, 2010 and March 30, 2010.  On April 13, 2010 Plaintiff and Defendant each filed their proposed Post-Trial Findings of Fact and Conclusions of Law, and on April 20, 2010 each party filed responses.  After considering the evidence, briefs, and arguments of counsel, the Court makes the following findings of fact and conclusions of law.[1]

**I.      PROCEDURAL AND FACTUAL BACKGROUND**

Plaintiff 3000 E. Imperial, LLC ("Plaintiff") filed its initial complaint on June 18, 2008.  Defendants Whittaker Corporation ("Defendant") and Whittaker Controls, Inc. filed

---

[1]      The Court has elected to issue its findings in narrative form.  Any finding of fact that also constitutes a conclusion of law is hereby adopted as a conclusion of law, and any conclusion of law that also constitutes a finding of fact is hereby adopted as a finding of fact.

1   its second amended answer and counterclaims on July 20, 2009.[2/]  Plaintiff filed its answer

2   to Defendant's counterclaims on July 28, 2009.  Plaintiff asserts the following causes of

3   action against Defendant: (1) Cost recovery and declaratory relief under the Comprehensive

4   Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601,

5   et seq.; (2) Injunctive relief under the Resource Conservation and Recovery Act ("RCRA"),

6   42 U.S.C. § 6972(a); (3) Contribution under California Health & Safety Code § 25395.60, et

7   seq.; (4) Nuisance; and (5) Trespass.  Defendant asserts the following causes of action

8   against Plaintiff: (1) Cost recovery, contribution, and declaratory relief under CERCLA; (2)

9   indemnity/contribution under California Health & Safety Code § 25363(e); (3) declaratory

10  relief; and (4) equitable indemnity.

11        Plaintiff purchased the property located at 3000 E. Imperial Highway in Lynwood,

12  California (the "Property") on November 30, 2006 and is the current owner.  Wm. R.

13  Whittaker Co. Ltd., a predecessor-in-interest to Defendant, owned the Property from June

14  30, 1955 to September 27, 1963.  For several years, Defendant operated a plant which

15  manufactured aircraft and missile valves on the Property.  Prior to Defendant, the Property

16  was owned by Robertshaw Controls Company ("Robertshaw").[3/]  After Defendant left the

17  Property it was used by various furniture manufacturers.

18        Prior to purchasing the Property, Plaintiff learned that it was contaminated with

19  various chemicals, although it did not know the nature and extent of the contamination.

20  (Chae Decl. ¶ 5.)  Plaintiff hired an environmental consulting firm to conduct an

21  investigation, which included taking soil and water samples.  These investigations continued

22  after Plaintiff purchased the Property.  The investigations revealed that the soil and

23

24  [2/]      The parties lodged a Proposed Pretrial Conference Order on February 19, 2010

25  dismissing Whittaker Controls, Inc. from this action on the condition that, for purposes of
     this action only, Whittaker Corporation agrees to be responsible for and assume all liability

26  of Whittaker Controls, Inc.  The parties also stipulated that any party may reference
     Whittaker Corporation as the owner and operator of the Property during the time period in

27  question.

28  [3/]      Robertshaw was also named as a defendant in this action, but it settled prior to trial.

1  groundwater on the Property are contaminated with several substances, including

2  trichloroethylene ("TCE") and benzene, which are the primary chemicals of concern.

3       The Property is rectangular in shape and is located at the southwest corner of State

4  Street and East Imperial Highway.  (Ex. 56.)  The Property consists of a vacant concrete lot,

5  as all structures were demolished in 2007.  (Ex. 241, § 2.1.)  Prior to demolition 90% of the

6  Property was occupied by a manufacturing building on the eastern portion of the Property.

7  (Id.)  There was also a lumber storage and hazardous materials storage shed on the

8  westernmost portion of the Property, and a maintenance shed located between the

9  manufacturing building and the storage sheds.  (Ex. 56.)  An underground storage tank

10  ("UST") nest was located under the pavement between the maintenance shed and the storage

11  sheds.  (Id.)  These structures existed on the Property in 1956 during Defendant's ownership.

12  (Ex. 268.)

13       In September 2007, Plaintiff's environmental consultant prepared a report which

14  summarized and compiled data from previous investigations of the Property.  (Ex. 241.)  The

15  report describes two areas of contamination on the Property.  One area is located at the

16  southwestern portion of the Property ("Area 1"), and the other is located at the south-central

17  portion of the Property ("Area 2").  (Id. § 3.1.6.2.)  Area 2 encompasses the former site of

18  the manufacturing building.  Most of the contamination on the Property is located in Area 1,

19  near the former UST nest.  (Id. § 5.2.1.1.)  Other contamination in Area 1 is located under

20  the maintenance shed and under the hazardous materials storage shed on the westernmost

21  portion of the Property.  (Id.)  Contamination from Area 1 appears to have spread to

22  neighboring properties to the southwest of the Property, although the exact extent of any

23  offsite contamination is still unknown.  (Id., § 7.1.1.)

24  **II.    DEFENDANT'S LIABILITY UNDER CERCLA**

25       CERCLA, 42 U.S.C. § 9607(a), allows private parties to recover costs incurred in

26  cleaning up contaminated sites from certain parties enumerated by statute.  To establish

27  liability for cost recovery a plaintiff must prove, by a preponderance of the evidence, that (1)

28  the property is a "facility" as defined by 42 U.S.C. § 9601(9); (2) the defendant falls into one

1  of the four categories of persons subject to liability under 42 U.S.C. § 9607(a); (3) that a

2  release or threatened release of a hazardous substance has occurred; and (4) that the release

3  or threatened release has caused the plaintiff to incur necessary response costs consistent

4  with the National Contingency Plan.  Carson Harbor Village v. County of Los Angeles, 433

5  F.3d 1260, 1265 (9th Cir. 2006).

6        **A.    Facility**

7        CERCLA defines a facility as "any site or area where a hazardous substance has been

8  deposited, stored, disposed of, or placed, or otherwise come to be located . . . ."  42 U.S.C. §

9  9601(9)(B).  TCE and benzene are considered "hazardous substances" under CERCLA.  See

10  42 U.S.C. §§ 9601(14), 9602(a); 40 C.F.R. §302.4.  It is undisputed that hazardous

11  substances are located at the Property, and that it thus qualifies as a facility under CERCLA.

12  (Proposed Pretrial Conference Order ("PPTCO"), Admitted Fact (a); Pl.'s Proposed Findings

13  of Fact and Conclusions of Law ("PFOFCOL") 36:4-5; Def.'s Response 36:4-5.)

14        **B.    Persons Liable Under CERCLA**

15        CERCLA imposes strict liability on four categories of persons, typically referred to

16  as "potentially responsible parties" or "PRPs."  See Burlington N. & Santa Fe Ry. Co. v.

17  United States, __ U.S. __, 129 S. Ct. 1870, 1878, 173 L. Ed. 2d 812 (2009).  One of those

18  categories is former owners or operators of a facility, defined as "any person who at the time

19  of disposal of any hazardous substance owned or operated any facility at which hazardous

20  substances were disposed of."  42 U.S.C. § 9607(a)(2).  For purposes of CERCLA, a

21  corporation such as Defendant qualifies as a "person."  42 U.S.C. § 9601(21).  TCE and

22  benzene are considered "hazardous substances" under CERCLA.  See 42 U.S.C. §§

23  9601(14), 9602(a); 40 C.F.R. §302.4.  "Disposal" is defined as the "discharge, deposit,

24  injection, dumping, spilling, leaking or placing of any solid waste or hazardous waste into or

25  on any land or water so that such solid waste or hazardous waste or any constituent thereof

26  may enter the environment . . . ."  42 U.S.C. §§ 9601(29); 6903(3).  A plaintiff does not have

27  to show that the defendant participated in the disposal, only that a disposal occurred during

28  ownership.  See Nurad, Inc. v. William E. Hooper & Sons Co., 966 F.2d 837, 840 (4th Cir.

1992); <u>Servco Pacific Inc. v. Dods</u>, 193 F. Supp. 2d 1183, 1197 (D. Hawai'i 2002)(noting that the Ninth Circuit has "concluded (or strongly implied) that passive gradual 'leaking' such as that from an underground storage tank with a hole in it or from an abandoned barrel would constitute a 'disposal'" for purposes of finding past owner liability).

In order for Defendant to be a PRP Plaintiff must show that a disposal occurred on the Property during Defendant's ownership between 1955 and 1963. As discussed below, the evidence presented at trial shows that disposals from various sources occurred during this time period.

### 1.   Disposal from the USTs

The USTs were installed in 1942 by Robertshaw. (PPTCO, Stipulated Fact (d); Pl.'s PFOFCOL 5:1; Def.'s Response 5:1.). Plaintiff arranged to have the contents of the USTs removed in 2007, and the USTs themselves were removed in 2009. (Crews Decl. ¶ 4, 10.) The parties agree that TCE was released from the USTs into the soil and groundwater. (PPTCO, Admitted Fact (l); Pl.'s PFOFCOL 5:10-12; Def.'s Response PFOFCOL 5:10-12.) The parties dispute when the USTs first began to leak. In order for Defendant to be a PRP Plaintiff must show that the USTs were leaking sometime during the 13 to 21 years after their installation (from 1955 to 1963).

### Testimony of Plaintiff's Expert James Bushman

Plaintiff's expert James Bushman opined that it is highly likely that leaks began between 1952 and 1957 and that leaking likely occurred between 1955 and 1963. (Bushman Decl. ¶ 19.) Defendant argues that Bushman's testimony does not meet the requirements for an expert opinion under Federal Rule of Evidence 702, and moves to exclude the opinion.

Rule 702 states that expert testimony is admissible if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. "This entails a[n] assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or

-5-

1  methodology properly can be applied to the facts in issue." Daubert v. Merrell Dow

2  Pharms., Inc., 509 U.S. 579, 592-93, 113 S. Ct. 2786, 2796, 125 L. Ed. 2d 469 (1993).

3  Factors which may bear on the reliability of the expert's methods include: (1) whether the

4  theory or technique can be, or has been, tested; (2) whether the theory or technique has been

5  subjected to peer review and publication; (3) the known or potential rate of error; (4) the

6  existence of standards and controls for application of the technique; and (5) general

7  acceptance in the community. Id. at 593-95, 113 S. Ct. at 2797. These are not the only

8  factors that a court may consider, and some factors may not apply in every case. Kumho

9  Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141-42, 119 S. Ct. 1167, 1171, 143 L. Ed. 2d

10  238 (1999). "[T]he trial judge must have considerable leeway in deciding in a particular

11  case how to go about determining whether particular expert testimony is reliable." Id. at

12  152, 119 S. Ct. at 1176.

13       To reach his opinion Bushman reviewed the facts discussed further below, and then

14  relied on his 47 years of experience evaluating UST corrosion. (Bushman Decl. ¶ 15.)

15  During cross-examination Defendant's counsel pointed out that there is no known error rate

16  for evaluations based on this method, nor has it ever been included on the list of testing

17  programs for determining the life of a UST published by the Environmental Protection

18  Agency. (Trial Transcript ("TT") 149:3-11). Expert testimony based on experience alone

19  or in conjunction with other knowledge or training can be admissible. See Fed. R. Evid.

20  702, Advisory Committee Notes 2000. However, "[i]f the witness is relying solely or

21  primarily on experience, then the witness must explain how that experience leads to the

22  conclusion reached, why that experience is a sufficient basis for the opinion, and how that

23  experience is reliably applied to the facts." Id.

24       Bushman explained that his opinion was based on the thickness of the USTs and the

25  resistivity of the soil. (Bushman Decl. ¶ 8.) Thicker tank walls result in slower corrosion,

26  and lower soil resistivities result in faster corrosion. (Id.) Soil with a resistivity of 10,000

27  ohm-centimeters is considered corrosive to steel, and below 1000 ohm-centimeters the soil is

28  considered extremely corrosive. (Id. at ¶ 8.) Bushman also considered the "Sohio" study,

which looked at the corrosion rates of USTs made by a certain manufacturer in Ohio during the 1960's.  (<u>Id.</u> at ¶ 18.)  The study showed that 55% of the USTs leaked within the first 15 years of service and 70% of the USTs leaked within the first 20 years of service.  (<u>Id.</u>)

In light of these principles, several facts indicated to Bushman that the USTs on the Property would have corroded faster than those in the Sohio study.  First, the soil resistivity in the Sohio study was higher than that of the soil on the Property.  (<u>Id.</u>)  Samples taken from the area surrounding the USTs suggested that the soil was corrosive, with a resistivity of 970 ohm-centimeters at one location and 2,000 ohm-centimeters at another.  (<u>Id.</u> at ¶ 9.)  The USTs were made of 12-gauge steel which is .1046 inches thick, and 14-gauge steel which is .0747 inches thick.  (<u>Id.</u> at ¶ 10.)  Therefore the USTs on the Property were much thinner than typical USTs in production today, which are .25 inches thick, and would have corroded faster.  (<u>Id.</u>)  Finally, Bushman testified that the number and size of the perforations on the USTs were much greater than any he had observed during his career.  (<u>Id.</u>)  Comparing the conditions in the Sohio study to those at the Property, Bushman concluded that the USTs likely began to leak within 10 to 15 years of installation.  (<u>Id.</u> at ¶ 19.)

Bushman later confirmed his opinion by using the Rossum Formula, which is used to predict the time to failure of a UST.  (<u>Id.</u> at ¶ 16.)  The Rossum Formula is accepted, well-recognized, and used by the U.S. Army Corps of Engineers in their work concerning USTs.  (TT 152:11 - 153:7.)  Using the Rossum formula, Bushman calculated that the time to first leak for the USTs was either 6 or 12.1 years, depending on which of the two soil resistivity levels was used.  (Bushman Decl. ¶ 17.)  One of the variables in the Rossum formula is the surface area of the tank.  (TT 154:4-6.)  Defendant's counsel criticized Bushman for using the combined surface area of the nine USTs in his calculations.  (TT 153:25-154:3.)  Bushman explained that using combined surface area was necessary because the USTs are tied together electrically and thus considered one single structure.  (TT

1  155:2-7.)  Defendant's expert Jose Villalobos[4/] later confirmed that if the USTs were

2  electrically connected, it would be proper to use the combined surface area instead of the

3  individual surface areas. (TT 391:7-9.)  As such, it does not appear that Bushman applied the

4  Rossum formula unreliably to the facts of this case.  Because Bushman's opinion was not

5  based solely on his experience, but was also supported by the results of the Rossum formula,

6  which is an accepted method for calculating the time to first leak, the Court cannot say that

7  Bushman's opinion is so unreliable as to be inadmissible.

8          Defendant's counsel did, however, point out several weaknesses in Bushman's

9  methods which would tend to lessen the weight of his opinion.  For example, Bushman

10  testified that the most important variables in determining the corrosion rate for the USTs are

11  the thickness of the USTs and the soil resistivity levels.  The soil samples that Bushman

12  relied on were taken from one boring at 5 feet and another at 10 feet.  (TT 164:3-5.)   These

13  samples were taken after the USTs had already been excavated and the soil backfilled into

14  the ground.  (TT 164:13-16.)  Therefore it is likely that the soil samples were not taken from

15  the soil immediately adjacent to the USTs when they were in the ground.  Bushman also

16  admitted that soil resistivity could vary widely over a short distance, and that the USTs were

17  likely installed in an area spanning approximately 40 feet.  (TT 164:10-12; 165:5-166:6.)

18  Although Bushman also testified that there appeared to be little variability in the soil at the

19  Property, it is likely that the actual resistivity levels of the soil immediately adjacent to the

20  USTs were different from the levels in the soils samples. (TT 166:24-167:15.)  Since

21  Bushman's opinion relies heavily on the soil resistivity levels, his opinion is afforded less

22  weight.

23          Defendant also argued that Bushman's opinion does not prove that the USTs leaked

24  during its ownership unless Plaintiff can show that the USTs were full of TCE when

25  Robertshaw left the Property.  Defendant's counsel claimed in his opening statement that

26  Robertshaw would have emptied the USTs prior to leaving the Property; however, there was

27

28  [4/]      Jose Villalobos was retained by Robertshaw, not Defendant.  However, the Court
refers to Villalobos as Defendant's expert, since Defendant called Villalobos as a witness.

1   no evidence to support such a claim.  Nevertheless, assuming that Robertshaw had tried to

2   empty the USTs when they left the Property it is still more likely than not that some TCE

3   remained and leaked into the soil.  Michael Crews, who was present when the USTs were

4   excavated, observed that the suction pipe extending into the UST could not reach the bottom

5   of the UST.  (TT 119:21-120:7.)  Pictures of the USTs upon excavation show that there were

6   corrosion holes around the entire circumference of the USTs.  (Ex. 310.)  Therefore, even if

7   Robertshaw had attempted to remove the contents of the USTs there would have still been

8   some amount of liquid left inside which could leak into the surrounding soil.

9         Testimony of Defendant's Expert Jose Villalobos

10         Villalobos testified that the average corrosion rate for buried steel in general soil

11   conditions in southern California is 2 mils per year.[5]  (TT 403:23-25.)  However, given the

12   soil resistivity levels of the samples taken from the Property Villalobos estimated that the

13   USTs had a higher average corrosion rate of 3 mils per year.  (TT 383:17-24.)  The 12-gauge

14   USTs at the Property were 105 mils thick, and the 14-gauge USTs were 74 mils thick.  By

15   dividing the thickness of the tanks by the average corrosion rate of 3 mils per years,

16   Villalobos calculated that the 12-gauge USTs would have started leaking 35 years after

17   installation, and the 14-gauge USTs within 25 years of installation.  (TT 387:11-16;

18   401:4-8.)

19         However, Villalobos also explained that 3 mils per year is an average corrosion rate.

20   A UST will corrode at a higher rate when first buried, and then the corrosion rate slows over

21   time.  (TT 394:1-21; 396:5-17.)  He also testified that the parts of a UST do not corrode

22   uniformly, and that in his experience he has seen a UST with an average corrosion rate of 3

23   mils per year corrode at a rate of 5, 8, or even 10 mils per year in some parts.  (TT

24   396:24-397:16; 399:18-400:3.)  This means that the average corrosion rate of a UST does

25   not necessarily predict when a tank would start to leak.  (TT 403:6-14.)

26

27

28   [5]    A "mil" is one-thousandth of an inch.  (TT 396:9-10.)

-9-

Using a higher corrosion rate of 5, 8, or 10 mils per year to calculate the time to first leak makes more sense than using the average corrosion rate in light of Villalobos' other testimony.  If one was to calculate the time to first leak using southern California's average corrosion rate of 2 mils per year, then a 12-gauge tank would take more than 52 years to corrode.  However, Villalobos testified that an average UST begins to corrode within 15 years of installation.  (TT 393:21-25; 395:21-396:4.)  Such a result is possible only if one uses a higher corrosion rate to account for the years when the UST is first installed.  Indeed, using a corrosion rate of 7 mils per year on a 12-gauge tank yields a result of 15 years to the first leak.

The Court finds that a tank with an average corrosion rate of 3 mils per year would have had a higher corrosion rate of 5, 8, or even 10 mils per year during the years when Robertshaw and Defendant owned the Property.  Villalobos testifed that if part of a UST were to corrode at a rate of 10 mils per year, a leak would develop within 10 years for a 12-gauge tank, and within 7.5 years for a 14-gauge tank.  (TT 401:9-25.)  Even using a more conservative corrosion rate of 8 mils per year, this would mean that the USTs began to leak within approximately 13 years for a 12-gauge tank, and approximately 9 years for a 14-gauge tank.

### The USTs Leaked During Defendant's Ownership of the Property

Depending on the method used, Bushman's testimony suggests that the USTs began leaking at the earliest within 6 years of installation in 1948 (calculated using the lower soil resistivity level in Rossum's formula) and at the latest within 15 years of installation in 1957 (Bushman's outer estimate of when the tanks first began to leak).  Although Defendant offered Villalobos' testimony as evidence that the USTs did not leak until much later, Villalobos' testimony instead corroborates that the leaks likely began within this time frame, somewhere within 7.5 to 13 years after installation, between 1949 to 1955.  Neither party has argued that the entire contents of the USTs leaked out immediately, and common sense suggests that once a corrosion hole developed the USTs would have leaked for some period of time.  See Nurad, Inc. v. William E. Hooper & Sons Co., 966 F.2d 837, 846 (4th Cir.

-10-

1992)(finding defendants liable due to a leaking UST when neither party could overcome "the presumption that the leaking that has occurred was not a sudden event, but the result of a gradual and progressive course of environmental contamination that included these defendants' period of ownership"). Given the time span for when the first leak occurred, the Court finds that the USTs were leaking at some point during Defendant's ownership from 1955 to 1963.

### 2.   Maintenance Shed

TCE and PCE were found at shallow soil depths in area of the maintenance shed. (Morrison Decl. ¶ 48; Ex. 202.) The fact that the TCE was found in shallow soil indicates that contamination was due to surface spills, as opposed to underground leakage from the USTs. (Morrison Decl. ¶ 48; TT 237:14-20.) Defendant stored flammable chemicals needed for testing and cleaning valves in 55-gallon drums in the maintenance shed. (TT 291:16 - 292:19; Grund Decl. ¶ 26.) Used chemicals were also stored in 55-gallon drums until an outside company removed them from the Property. (TT 270:6-18.)

Defendant claims that TCE spills from the 55-gallon drums could not have occurred during its ownership because it never used TCE in its operations. To support this claim Defendant relies exclusively on the testimony of David Grund, who worked for Defendant at the Property as a maintenance mechanic from approximately 1957 to 1960. (Grund Decl. ¶¶ 3-12.) During the 1960s TCE was frequently used to clean metal using vapor degreasers. (Morrison Decl. ¶ 29.) Degreasing was necessary during valve production. (TT 286:112-14.) Defendant was engaged in manufacturing valves for military aircraft and missiles. (PPTCO, Stipulated Fact (a); Ex. 275.) Military publications by the Secretary of the Air Force during the 1950's specify that TCE be used for overhauling the butterfly valves manufactured by Defendant. (Morrison Decl. ¶ 25; Exs. 270, 275.) Nevertheless, Grund testified that Defendant did not use TCE while on the Property, nor did it use a vapor degreaser which would have used TCE. (Grund Decl. ¶ 18, 22; TT 270:19-271:6.) Instead, any cleaning of valves at the Property was done using a water soluble boron-type material or toluene. (TT 271:7-22; Grund Decl. ¶ 24.) Furthermore, although it was not Grund's job to

-11-

1    deal with defective valves, he testified that valves were never overhauled at the Property;

2    rather, any defective valves were replaced with new ones.  (TT 272:15-273:22.)

3        The Court does not find Grund's testimony to be credible or reliable, due to several

4    inconsistent statements and the fact that Grund was testifying about events that occurred

5    more than fifty years ago.  Defendant had operations at several different locations during the

6    years of Grund's employment, some of which used vapor degreasers with TCE.  During trial

7    Grund testified inconsistently about when and where Defendant had used vapor degreasers

8    with TCE, leading the Court to conclude that Grund's testimony about the lack of TCE at the

9    Property is likely inaccurate.  For instance, when asked about Defendant's use of a vapor

10   degreaser at its Van Nuys facility Grund initially testified that there was none.  (TT

11   304:23-305:3.)  Later, when faced with contradictory testimony from his deposition, Grund

12   recalled that Defendant did indeed use a vapor degreaser with TCE at Van Nuys.  (TT

13   304:23-307:1.)  Moreover, in contrast with his earlier testimony, Grund later testified that he

14   would occasionally see valves being overhauled at the Property.  (TT 279:23-280:8.)

15       Grund also testified that prior to moving to the Property Defendant used a vapor

16   degreaser in its operations at its Vernon facility and that Defendant used TCE in its vapor

17   degreaser in North Hollywood after it moved off the Property.  (TT 286:10 - 287:11;

18   270:23-271:1.)  Throughout its time at these locations Defendant's operations were

19   essentially the same, manufacturing valves.  (TT 287:12 - 22; 298:7-11; 306:5-12.)  Thus,

20   the evidence shows that Defendant was using vapor degreasers with TCE in similar

21   operations both before and after it occupied the Property, Defendant may have overhauled

22   valves on the Property, and that the valves Defendant manufactured for the military would

23   have been overhauled using TCE.

24       In light of such evidence the Court finds that Defendant used TCE while it was

25   operating on the Property.  Since Defendant stored the chemicals used in its operations in the

26   maintenance shed area, the Court finds that a disposal of TCE occurred in that area while

27   Defendant owned the Property.  Due to releases in both the maintenance shed area and the

28   UST nest area during 1955 to 1963 Defendant is a PRP under CERCLA.

## C.   Release and Incurrence of Necessary Response Costs

CERCLA defines a "release" as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment . . . ."  42 U.S.C. § 9601(22).  The parties do not dispute that a release of a hazardous substance occurred on the Property for purposes of CERCLA.  (PPTCO, Admitted Fact (l); Pl.'s PFOFCOL 36:24-25; Def.'s Response 36:24-25.)  The parties also agree that the release caused Plaintiff to incur necessary response costs consistent with the National Contingency Plan.  (Pl.'s PFOFCOL 37:1-2; Def.'s Response, 37:1-2).

Since all four requirements have been met, the Court finds that Defendant is liable under CERCLA.

## III.   DIVISIBILITY OF HARM

Liability under CERCLA is generally joint and several unless the defendant meets its burden to prove that the harm is divisible and capable of apportionment.  Burlington N. & Santa Fe Ry. Co. v. United States, __ U.S. __, 129 S. Ct. 1870, 1881, 173 L. Ed. 2d 812 (2009).  "'[T]he universal starting point for divisibility of harm analyses in CERCLA cases is § 433A of the Restatement (Second) of Torts."  Id. (quoting United States v. Hercules, Inc., 247 F.3d 706, 717 (8th Cir. 2001)).  Under that section of the Restatement "when two or more persons acting independently caus[e] a distinct or single harm for which there is a reasonable basis for division according to the contribution of each, each is subject to liability only for the portion of the total harm that he has himself caused."  Id. (quoting Restatement (Second) of Torts, § 433A (1976)).  "Evidence supporting divisibility must be concrete and specific."  Hercules, 247 F.3d at 718.

Harm can be divisible even if the contamination contributed by each defendant is commingled.  United States v. Alcan Aluminum Corp., 964 F.2d 252, 270 n.29 (3d Cir. 1992).  For instance, "[a] site may be divisible if a defendant can establish that it consists of 'non-contiguous' areas of contamination."  Hercules, 347 F.3d at 719.  Even where contamination is commingled in a single area, the comments to the Restatement suggest the harm can be divisible in terms of degree:

The harm inflicted may be conveniently severable in point of

time.  Thus if two defendants, independently operating the same

plant, pollute a stream over successive periods, it is clear that

each has caused a separate amount of harm, limited in time, and

that neither has any responsibility for the harm caused by the

other . . . .

Where two or more factories independently pollute a stream, the

interference with the plaintiff's use of the water may be treated

as divisible in terms of degree, and may be apportioned among

the owners of the factories, on the basis of evidence of the

respective quantities of pollution discharged into the stream.

Restatement (Second) of Torts, § 433A, Comments c., d.

A review of the Restatement and case law demonstrates that in order to treat

contamination as divisible in terms of degree, the defendant must show two things.  First, it

must identify and prove some definite proportion which can be used to apportion liability.

See Chem-Nuclear Sys., Inc. v. Bush, 292 F.3d 254, 260 (D.C. Cir. 2002)(holding that the

harm was not divisible where there was insufficient evidence showing that the defendant

sent only 80 drums of waste to the contaminated site); O'Neil v. Picillo, 883 F.2d 176, 182

(1st Cir. 1989)(holding that the harm was indivisible because, although only 10 barrels of

waste could be positively attributed to defendant, there was no evidence that some of the

9,000 unidentified barrels were not also contributed by defendant); Restatement, § 433A,

Comment d., Illustration 3 (noting that the harm caused by five dogs owned by A and B who

killed ten sheep can be divisible when "[t]here is evidence that three of the dogs are owned

by A and two by B.").

Next, the defendant must also provide evidence supporting a relationship between the

proportion it has proposed and the amount of harm that is attributable to the defendant.  See

Burlington, 129 S. Ct. at 1882 n.9 (affirming the district court's use of certain figures to

apportion damages because it "was properly rooted in evidence that provided a reasonable

-14-

1  basis for identifying the portion of the harm attributable to the [defendants]"); Bell, 3 F.3d at

2  889 (noting that volume of waste contributed may sometimes be inadequate to apportion

3  liability "where commingled wastes of unknown toxicity, migratory potential, and

4  synergistic effect are present"); O'Neil, 883 F.2d at 183 n.11 (noting that apportionment

5  based on the number of barrels attributable to the defendant would be unreasonable unless

6  the defendant could show that the cost of removing each barrel "did not vary depending on

7  [its] content"); U.S. v. Monsanto Co., 858 F.2d 160, 172-73 (4th Cir. 1988)(discussing why

8  volume of waste contributed does not always provide an adequate basis for divisibility, since

9  "[c]ommon sense counsels that a million gallons of certain substances could be mixed

10  together without significant consequences, whereas a few pints of others improperly mixed

11  could result in disastrous consequences"); Restatement, § 433A, Comment d., Illustration 3

12  (stating that the harm caused by three dogs owned by A and two dogs owned by B could be

13  apportioned using a 3:2 ratio assuming that "all of the dogs are of the same general size and

14  ferocity").  In other words, although causation is not required to show liability under

15  CERCLA, the burden Defendant must meet in order to reduce its liability under the doctrine

16  of divisibility is essentially a burden to prove that it caused only some part of the

17  contamination, and how much.  See U.S. v. Alcan Aluminum Corp., 990 F.2d 711, 722 (2d

18  Cir. 1993)("[C]ausation is brought back into the case – through the backdoor, after being

19  denied entry at the frontdoor – at the apportionment stage.").

20       Here Defendant has proposed using two figures to establish that the contamination is

21  divisible in terms of degree: the relative sizes of Area 1 and Area 2, and the number of years

22  which it owned the land.  The Supreme Court's recent decision in Burlington N. & Santa Fe

23  Ry. Co. v. United States, __ U.S. __, 129 S. Ct. 1870, 173 L. Ed. 2d 812 (2009) found

24  divisibility based on similar figures.  However, Burlington did not relieve Defendant from

25  supporting its divisibility arguments with evidence that these figures bear a relationship to

26  amount of harm that it caused.  In Burlington the facility consisted of two adjacent parcels of

27  property, one owned by the two defendant railroads and one owned by a company engaged

28  in agricultural chemical distribution.  The company had leased the defendants' property for

-15-

1    use in its operations for 13 of the 28 years it was in business.  The Court found that it was

2    reasonable to apportion the defendants' liability based on the proportion of the facility

3    owned by the defendants (19%) and the length of time that the defendants' property had been

4    leased for use in the company's operations (45%).  Id. at 1882.

5         The facts and reasoning of Burlington demonstrate that the Court was concerned with

6    finding evidence to support a relationship between these figures and the amount of harm

7    caused by the defendants, although it did not seem to require the exact fit which some

8    previous cases had held was necessary.  For instance, apportioning liability by the

9    proportion of land owned by the defendants was reasonable in light of evidence that only a

10   few of the spills contributing to the contamination occurred on the defendants' land as

11   opposed to the remainder of the facility.  Id. at 1883.  As for the number of years of

12   operation on the defendants' land, such apportionment was logical since all contamination

13   was caused by spills of various chemicals which occurred continually over the course of 28

14   years of operation.  Id. at 1876.  There was no indication that the company's operations

15   changed over the 28 years, and thus the amount of contamination released would have

16   remained fairly constant each year.

17        Defendant proposes using the sizes of Area 1 and Area 2 as a basis for divisibility,

18   which comprise 55% and 45% of the contaminated area respectively.  Defendant argues that

19   the Court should apportion its liability by 55% since there is no evidence that it used TCE or

20   benzene in their operations in Area 2, and thus the only contamination that it could be

21   responsible for was the leaking USTs located in Area 1.  This argument necessarily relies on

22   Grund's testimony that Defendant never used TCE in its operations on the Property, since

23   Area 2 comprises the area underneath the former manufacturing building where degreasing

24   and assembly of valves would have occurred.  (TT 275:5-10.)  As the Court has found that

25   Defendant did use TCE in its operations, this argument fails to support divisibility based on

26   the respective sizes of Areas 1 and 2.  Furthermore, although Defendant argues that the

27   furniture makers who later occupied the Property were also responsible for some of the

28   contamination in Area 2, they have not provided any evidence which demonstrates how

much contamination the furniture makers contributed.  Unlike in <u>Burlington</u>, where the evidence showed that the defendant's use of the land only contributed to a small amount of the total contamination, here there is no evidence showing Defendant's relative contribution to the contamination in Area 2 as compared to the furniture makers.

Defendant also proposes using the number of years of its ownership as a basis for apportioning liability.  Defendant notes that the USTs were installed in 1942 and removed in 2009, which means they were in the ground for 67 years.  Defendant further notes that they owned the Property for eight years, which is 12% of the time the USTs were in the ground.  Apportioning liability by 12% might be reasonable if there were some evidence that the USTs leaked steadily during the entire 67 years they were in the ground.  Yet it is entirely possible that most, if not all, of the TCE leaked out of the USTs during Defendant's ownership.  Indeed, Defendant itself argued that any release of TCE in Area 1 after 1963 was "de minimis."  (Def.'s PFOFCOL 29:14-15.)  In such a case Defendant's contribution to the harm caused by the leaking USTs would be much greater than 12%.  Since Defendant has not pointed to any evidence supporting use of the proportion it has proposed, it is not entitled to divisibility.

## IV.  PLAINTIFF'S STATUS AS A BONA FIDE PROSPECTIVE PURCHASER

Defendant has brought a counterclaim against Plaintiff for cost recovery/contribution under CERCLA, since Plaintiff, who is the current owner of a facility where a release has occurred, is also considered a PRP.  <u>See</u> 42 U.S.C. § 9607(a)(1).  Plaintiff claims that it is not subject to liability because it is a bona fide prospective purchaser who is not liable under CERCLA.  <u>See</u> 42 U.S.C. § 9607(r) ("[A] bona fide prospective purchaser whose potential liability for a release or threatened release is based solely on the purchaser's being considered to be an owner or operator of a facility shall not be liable as long as the bona fide prospective purchaser does not impede the performance of a response action or natural resource restoration.").

Plaintiff has been cooperating with the California Department of Toxic Substances ("DTSC") to coordinate a voluntary cleanup of the Property since May 2007.  (Diaz Decl. ¶

5.)  The DTSC has already found Plaintiff to be a "bona fide purchaser" under California

Health & Safety Code § 25395.69, which largely mirrors the definition of a bona fide

prospective purchaser under CERCLA.  (Ex. 221 § 3.3.)  While both statutes require that a

bona fide purchaser exercise "appropriate care" in dealing with the release of hazardous

substances, the statutes differ somewhat in their definition of appropriate care.  The

California statute defines "appropriate care" as the performance of response actions directed

by the DTSC.  See Cal. Health & Safety Code § 25395.67.  CERCLA, however, requires a

bona fide prospective purchaser to take "reasonable steps to (i) stop any continuing release;

(ii) prevent any threatened future release; and (iii) prevent or limit human, environmental, or

natural resource exposure to any previously released hazardous substance." 42 U.S.C. §

9601(40)(D).  Defendant challenges Plaintiff's status as a bona fide prospective purchaser by

arguing that Plaintiff unreasonably delayed in waiting two years after it purchased the

Property to excavate the USTs.

Plaintiff had the contents of the USTs sampled in May 2007.  (Ex. 241 § 4.5.)  In

September 2007 Plaintiff's environmental consultant reported that the TCE was detected in

those samples.  (Ex. 241 § 4.5.1.)  In October 2007 Plaintiff had the contents of the USTs

removed and placed into twenty 55-gallon drums, which were then removed from the

Property.  (Crews Decl. ¶ 4.)  TCE was later found to be present in an oily layer that floated

on top of the liquid withdrawn from the USTs.  (Id. ¶ 9.)  Since Plaintiff had the USTs

emptied soon after learning that they contained a hazardous substance, the Court finds that

the Plaintiff took reasonable steps to stop any continuing leak or to prevent any future leaks

of TCE from the USTs.  It was not unreasonable for Plaintiff to leave the USTs in the

ground at that time, given that they were empty.  Defendant contends that Plaintiff should

have also excavated the USTs in 2007 to prevent the possibility of surface water infiltration,

which could mix with any TCE left in the USTs and then leak into the ground.  However,

Defendant has not provided any evidence suggesting why Plaintiff would have had reason to

believe that the USTs were not emptied of TCE in 2007.  In fact, when the nine USTs were

excavated in 2009 only one of them was observed to have an oily layer on top.  (Id. ¶ 14.)

1  Although some TCE was later detected inside that UST its contents consisted almost entirely

2  of water, which suggests that very little TCE had been left inside since 2007.  (Id. ¶ 17.)

3  The Court finds that Plaintiff took reasonable steps to prevent further release of hazardous

4  substances, thus entitling it to bona fide prospective purchaser status.

5  **V.    AMOUNT OF NECESSARY RESPONSE COSTS**

6          Having found that Defendant is jointly and severally liable on Plaintiff's cost

7  recovery claim under CERCLA, the Court must resolve the amount of Defendant's liability.

8  The Court has already approved Plaintiff's settlement with Robertshaw, in which

9  Robertshaw agreed to be responsible for all future onsite and offsite remediation efforts.

10  The Court also approved Plaintiff's settlement with another defendant, Kold Industries, Inc.,

11  in the amount of $7,000.00.  Under CERCLA a settlement by one defendant "reduces the

12  potential liability of the others by the amount of the settlement."  42 U.S.C. § 9613(f)(2).

13  After accounting for Plaintiff's settlements with the other defendants, Defendant's liability is

14  equal to the amount of necessary response costs that Plaintiff incurred prior to settlement,

15  less $7,000.00.

16          The only evidence in the record of Plaintiff's costs is the declaration of Plaintiff's

17  principal Min Chae, who testified that Plaintiff has incurred $1,713,343.44 in investigation

18  and remediation expenses.  Over Defendant's objection the Court allowed Chae's testimony

19  on the amount of Plaintiff's expenses, as well as a spreadsheet attached to Chae's declaration

20  summarizing invoices totaling $1,713,343.44.  After Chae was done testifying, and after

21  Defendant declined to cross examine him, Defendant made a motion in limine seeking to

22  exclude evidence of any damages which were not produced during the course of discovery.

23  (TT 213:7-14.)  Defendant argued that Plaintiff had produced invoices reflecting

24  approximately $700,000 of costs during discovery, and asserted that it had never received

25  evidence of the remaining amount claimed.  Plaintiff asserted that it had invoices supporting

26  Chae's testimony and that these had been produced to Defendant.

27          The Court did not rule on the motion, pointing out that Defendant had declined to

28  cross examine Chae and that it was essentially asking for a "do-over."  Nevertheless, the

-19-

1   Court suggested it was not too late for Defendant to call Chae during its case if it wished to

2   question the basis for his testimony concerning Plaintiff's expenses.  After this exchange

3   Plaintiff filed a trial brief voluntarily reducing the expenses sought to $1,241,457.61 by

4   excluding any invoices which were arguably not recoverable costs under CERCLA.  On the

5   last day of trial Defendant's counsel stated that he had since reviewed the invoices which

6   Plaintiff claimed to have produced, but maintained that some of the invoices were not timely

7   produced during discovery.  The Court declined to resolve the issue during trial, instead

8   directing Defendant to submit a post-trial brief if it disputed the timeliness of the document

9   production.  Despite this invitation, Defendant has not filed any brief on this issue.  As such,

10  the only evidence the Court has of the recoverable costs is Chae's testimony of the amount

11  Plaintiff incurred, which was later voluntarily reduced to $1,241,457.61.  This amount, less

12  the $7,000.00 which Kold Industries, Inc. paid in settlement, results in Defendant's liability

13  of $1,234,457.61.

14  **VI.     DEFENDANT'S LIABILITY UNDER RCRA**

15          Plaintiff has also brought a claim against Defendant under the Resource Conservation

16  and Recovery Act ("RCRA"), 42 U.S.C. § 6091, et seq.  Defendant contends that Plaintiff's

17  RCRA claim is moot since Robertshaw has entered into a settlement agreement to undertake

18  all onsite and offsite remediation of the Property until the DTSC issues a certificate of

19  completion.  "RCRA's primary purpose . . . is to reduce the generation of hazardous waste

20  and to ensure the proper treatment, storage, and disposal of that waste which is nonetheless

21  generated, 'so as to minimize the present and future threat to human health and the

22  environment.'"  Meghrig v. KFC Western, Inc., 516 U.S. 479, 483, 116 S. Ct. 1251, 1254,

23  134 L. Ed. 2d 121 (1996) (quoting 42 U.S.C. § 6902(b)).  Therefore, a court may not order

24  restitution or damages under RCRA to a private citizen; a private citizen may only obtain

25  injunctive relief.  See id.; 42 U.S.C. § 6972(a)(1)(B).  A court has broad powers to either

26  restrain any person contributing to contamination, or "to order such person to take such other

27  action as may be necessary, or both."  42 U.S.C. § 6972(a)(1)(B).

28

1    In order to obtain an injunction under RCRA where a third party has already agreed

2    to undertake remediation, "plaintiff would have to identify some action that defendant could

3    be ordered to take that is not already in place thanks to the action of [the third party] and that

4    would improve the situation in some way." 87th Street Owners Corp. v. Carnegie Hill - 87th

5    Street Corp., 251 F. Supp. 2d 1215, 1220 (S.D.N.Y. 2002).  Since Robertshaw has already

6    agreed to undertake the entire remediation until completion, it is difficult to ascertain what

7    else the Court might order Defendant to do to improve the situation.  Plaintiff seeks an

8    injunction ordering Defendant to abate the contamination in case Robertshaw does not fulfill

9    its obligations under the settlement agreement.  However, there is no evidence that

10   Robertshaw does not plan to fulfill and complete its obligations under the settlement

11   agreement.  The mere possibility that Robertshaw might one day abandon its remediation

12   efforts, or become incapable of fulfilling them, is insufficient to entitle Plaintiff to injunctive

13   relief.  See id. at 1221(stating that an injunction ordering the defendant to undertake

14   remediation in case the state agency abandoned its efforts to remediate was premature, since

15   "[p]laintiff can bring an action when and if these events come to pass").

16   Plaintiff nevertheless claims that its RCRA claim is not moot because it has also

17   requested an award of attorneys' fees pursuant to RCRA.  RCRA states that a court may

18   award attorneys' fees "to the prevailing or substantially prevailing party, whenever the court

19   determines such an award is appropriate."  42 U.S.C. § 6972(e).  In order to be considered a

20   prevailing party a plaintiff must "receive at least some relief on the merits of his claim

21   before he can be said to prevail." Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist.,

22   489 U.S. 782, 792, 109 S. Ct. 1486, 1493, 103 L. Ed. 2d 866 (1989).  However, as just

23   explained, due to Plaintiff's settlement with Robertshaw there is no relief that the Court can

24   grant on the RCRA claim.[6/]  Plaintiff is not a prevailing party and therefore cannot recover

25

26   [6/]    Plaintiff cites Pakootas v. Teck Cominco Metals, Ltd. 452 F.3d 1066, 1071 n.10 (9th

27   Cir. 2006) for the proposition that a request for attorneys' fees is not necessarily rendered
      moot by a previous settlement.  Pakootas, which involved a claim under CERCLA and not

28   RCRA, is inapposite.  Although the settlement in Pakootas mooted the plaintiff's claim for

                                                                          (continued...)

attorneys' fees under RCRA.  Plaintiff's RCRA claim is moot, as is Plaintiff's request for

attorneys' fees pursuant to RCRA.

### Conclusion

For the foregoing reasons, the Court finds Defendant jointly and severally liable

under CERCLA.  Plaintiff is found to be a bona fide prospective purchaser under CERCLA,

and hence not liable under CERCLA.  The Court thus awards Plaintiff $1,241,457.61 as

recovery of its costs under CERCLA.  Plaintiff's RCRA claim is moot, as is Plaintiff's

request for attorneys' fees pursuant to RCRA.

DATED:  December 29, 2010

_____
                                                            Percy Anderson
                                   UNITED STATES DISTRICT JUDGE

---

6/        (...continued)
injunctive relief, the plaintiff was still able to pursue a claim for civil penalties under
CERCLA.  Id.  As such, it was not impossible for the Pakootas plaintiff to be considered a
"prevailing party" for purposes of attorneys' fees since it might have received some relief in
the form of civil penalties.

-22-